# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**UNITED STATES OF AMERICA**

**v.**

**ELBORIC QUADARIUS ROBINSON**
**a.k.a. "Bo"**
**a.k.a. "Bo-4K"**

**UNDER SEAL**
Case No.    1:20 mj 25 GRJ

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT

I, Bradley Dando, a Special Agent of the Federal Bureau of Investigation

(FBI), United States Department of Justice, being duly sworn, do depose and state

under oath as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     This affidavit concerns an investigation by law enforcement into

offenses under federal criminal law, specifically conspiracy to distribute controlled

substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846,

and related offenses.

2.     I am an "investigative or law enforcement officer" of the United

States, within the meaning of Section 2510(7) of Title 18, United States Code, that



FILED USDC FLND GV
MAY 19 '20 AM11:37

1

is, I am empowered by law to conduct investigations of, and to make arrests for,

offenses enumerated in Section 2516 of Title 18, United States Code.

3.      I am a Special Agent of the Federal Bureau of Investigation (FBI),

United States Department of Justice (DOJ), and have been so employed for over 17

years. I am currently assigned as the coordinator for the Jacksonville Division Safe

Streets Task Force, Gainesville Resident Agency. In my current capacity, I am

assigned to investigate all gang related crimes, including but not limited to,

narcotics trafficking, homicide, robbery, assault, weapons possession, the

investigation of organized criminal activity, and the laundering of monetary

instruments associated with these criminal matters. During the course of my career,

I have conducted numerous investigations of unlawful drug distribution in

violation of Title 21, United States Code 841(a)(1), and have conducted or

participated in physical surveillance, undercover operations, the execution of

search warrants, consensual monitoring, debriefing of confidential informants and

the use of pen registers. Prior to my current assignment, I was assigned as a Special

Agent to the Charlotte Division of the FBI, Greensboro Resident Agency, as the

coordinator for the Piedmont Triad Safe Streets Task Force. Prior to being

appointed as a Special Agent with the FBI, I was a Special Agent for the Florida

Department of Law Enforcement and a Deputy Sheriff for the Polk County, Florida Sheriff's Office.

4.      Through my training, education and experience, I have become familiar with the manner in which controlled substances are transported, distributed, and stored, and with the profit types and amounts routinely made by narcotics dealers. I am also familiar with the methods, language, and terms which are used to disguise narcotics trafficking and the methods of laundering the proceeds from the illegal narcotics sales. Specifically, I have become particularly familiar with the methods of importation and distribution of cocaine, cocaine base, which is commonly referred to as "crack" cocaine, heroin, methamphetamine, and marijuana. Based upon this experience, I am aware that cocaine, heroin, and methamphetamine are imported from outside the United States, primarily from Mexico, and other locations in South and Central America. Once within the borders of the United States, the cocaine, heroin, and methamphetamine are often sold in bulk quantities to mid-level distributors who then are responsible for supplying "street dealers". The same is true for the distribution of marijuana except much of the product is grown domestically in the United States and then broken down and distributed throughout the United States.

3

5.      This investigation concerns illegal trafficking in cocaine, cocaine base (crack cocaine), methamphetamine, marijuana, and other controlled substances. Identified through this investigation were Roddrae Antonio Williams, also known as (a.k.a.) "Dre," "Juice," and "Juvie," and referred in this affidavit as R.WILLIAMS, Elboric Quadarius ROBINSON, a.k.a. "Bo" and "Bo-4K", Daniel Heath WILLIS, Tomeka Necole BRYANT, a.k.a. "Sis", Gregory Lavough Williams, referred to in this affidavit as G.WILLIAMS, Rakeidra Alexandria NEAL, a.k.a "Rocki," Lorenza Aaron DURR, Jr., a.k.a. "Tootie" amd "Tootie Pop," Decoda Kadarrell KING, a.k.a. "King Coda," "King Koda," and "Coda," Jesse James Williams, Jr., a.k.a. "Rabbi," and referred to in this affidavit as J.WILLIAMS, and Rayme HERNANDEZ (collectively known herein as the TARGET SUBJECTS) have been involved in and continue to be involved in a conspiracy to distribute controlled substances, in violation of Title 21 U.S.C. § 846; in the distribution of, and in the possession with the intent to distribute, controlled substances, in violation of Title 21 U.S.C. § 841(a); and in the unlawful use of a communication facility, in violation of Title 21 U.S.C. § 843(b).

6.      The facts set forth in this Affidavit are based on my personal participation in this investigation and from information provided by special agents, task force agents, police officers, and deputy sheriff's (collectively referred to as

4

the "Agents") from various federal, state, and local law enforcement agencies,

confidential human sources (CHS) and on my experience, training, and

background as a Special Agent of the FBI.

7.     Because this affidavit is being submitted solely for establishing

probable cause to seek an arrest warrant for the Roddrae Antonio WILLIAMS (R.

WILLIAMS) and Elboric ROBINSON, for violations of Title 21 U.S.C. § 846; in

the distribution of, and in the possession with the intent to distribute, controlled

substances, Title 21 U.S.C. § 841(a); and the unlawful use of a communication

facility, in violation of Title 21 U.S.C. § 843(b). I have not included each and every

fact known to me concerning this investigation. I have set forth only the facts

necessary to support the issuance of a complaint.

## PROBABLE CAUSE

**Background about the Conspiracy and the Investigation**

8.     The Federal Bureau of Investigation (FBI), the federal Drug

Enforcement Administration (DEA), and state and local law enforcement agencies

have been conducting a long-term investigation into the drug-trafficking activities

of the 4K criminal street gang, and particularly about the drug-trafficking activities

of R.WILLIAMS and ROBINSON, who hold leadership positions in the 4K

criminal street gang in Alachua, Florida, and individuals working with

R.WILLIAMS and ROBINSON in their drug-trafficking activities.

9.     The "4K" criminal street gang originated within the city of Alachua,

Florida, and has spread into multiple municipalities and unincorporated areas

within Alachua County. In approximately January, 2017, a conflict arose between

members of 4K and a rival organization. Multiple shootings occurred in the city of

Alachua during the 2017 and 2018 calendar years, which resulted in several state

court arrests of 4K members for attempted homicide. One subject, 4K member

Kenzell Edwards, was sentenced on July 2, 2019, to fifteen years confinement

within the Florida Department of Corrections following a nolo contendere plea to

three counts of attempted second degree murder. Other 4K members, including

Jeffrey Robinson, Jr., and McKenzly Edwards, Jr., have remained in state custody

pending trial for six counts of attempted first degree murder.

10.    On or about January 16, 2018, a state search warrant, obtained in the

Eighth Judicial Circuit, in and for Alachua County, Florida, was served at a

residence maintained by NEAL located at 15604 NW 141st Street, Alachua,

Florida. Based upon surveillance by local law enforcement, this residence was

known to be frequented by 4K gang members, including R.WILLIAMS, and the

search warrant was based on probable cause that the home was being used for drug

sales by individuals known to be 4K gang members. The following items of contraband were found within the search: crack cocaine; marijuana; marijuana concentrate; ammunition in multiple calibers, including handgun and rifle rounds; a spent shell casing; a stolen Smith & Wesson (S&W) 9mm semi-automatic pistol; counterfeit US currency; drug paraphernalia, including crack cocaine cooking utensils, baggies, heat-sealed bags, grinder, and pipe; and multiple cellular telephones. A subsequent search of the electronic devices found at the residence revealed text message communications involving the sale of narcotics and information supporting the membership and association of multiple 4K gang members (e.g. multiple 4K gang members were contacts in one phone, a second phone appeared to belong to 4K gang member McKenzley "Kenny" Edwards and contained photos of the 4K group displaying hand signs and/or wearing apparel identifying themselves as 4K; a third cell phone appeared to belong to 4K gang member Jeffery "JJ" Robinson).

11.     On or about July 18, 2018, a state search warrant, obtained in the Eighth Judicial Circuit, in and for Alachua County, Florida, was served at the residence of DURR, located at 15509 NW 134th Terrace, Alachua, Florida. The following items of contraband were found during the search: crack cocaine;

powder cocaine; cannabis; a 9mm semi-auto pistol; ammunition; drug paraphernalia, including digital scales and baggies; and US currency.

12.     On or about July 18, 2018, a state search warrant, obtained in the Eighth Judicial Circuit, in and for Alachua County, Florida, was served at a residence located at 15418 NW 134th Terrace, Alachua, Florida. This particular residence was owned and maintained by Norris Robinson, the grandmother of ROBINSON and R.WILLIAMS (who are cousins). Both R.WILLIAMS and ROBINSON have listed this as their residence according to the Florida Department of Motor Vehicles Driver and Vehicle Identification Database (DAVID). In addition, the residence is known to be frequented by 4K gang members, including R.WILLIAMS and ROBINSON, because of surveillance by law enforcement officers. The following items of contraband were found during the search: multiple firearms, including a bolt action rifle and a revolver, ammunition in multiple calibers, including shotgun shells and 9mm rounds, marijuana, and drug paraphernalia. Of special note, marijuana bale wrappers (packaging for multiple-pound quantities of marijuana) were located on scene, which included approximately one pound of old marijuana remnants. The larger bulk packaging suggests that marijuana was being broken down at the residence from distributor to dealer-sized quantities.

13.    On or about October 5, 2018, ROBINSON was stopped for a traffic infraction by the High Springs, Florida Police Department. ROBINSON was arrested for a driving offense, and the vehicle was towed from the scene. During an inventory of the vehicle, the following items of contraband were found: cocaine, cocaine base (crack cocaine), a digital scale with white powdery residue, a razor with white powdery residue, and approximately $1,369 dollars of US currency. ROBINSON ultimately plead nolo contendere to state charges for possession of cocaine. He was adjudicated guilty and sentenced on February 6, 2020, to 24 months drug offender probation.

14.    Campus USA bank records show that on July 15, 2019, WILLIS deposited $2000 in 20 dollar bills, and the immediately withdrew $2000 in 100 bills. At the time, WILLIS had an account balance of $3.16.

15.    Hertz records show that WILLIS rented a vehicle in Gainesville, Florida on July 17, 2019.

16.    American Airlines records show that R.WILLIAMS flew to San Diego, California on July 21, 2019, and flew back to Tampa on July, 26, 2019.

17.    On July 25, 2019, R.WILLIAMS communicated via telephone with WILLIS 11 times. On July 26, 2019, R.WILLIAMS attempted five outgoing, unanswered communication events to WILLIS. Also on July 26, 2019, a traffic

9

stop was conducted on a Hertz rental vehicle driven by WILLIS, near Grants, New

Mexico. The New Mexico Department of Public Safety reported that WILLIS was

found in possession of approximately 23 kilograms (approximately 50 pounds) of

marijuana and over 600 vials of marijuana oil, which resulted in WILLIS' arrest.

WILLIS was released on bond on July 29, 2019. On the day of his release, WILLIS

placed an outgoing call to R.WILLIAMS which lasted approximately one minute

and six seconds. The criminal matter in New Mexico is open and pending as of

May 8, 2020, according to a public records query of nmcourts.gov.

18.     When WILLIS's rental vehicle was returned to Hertz on August 6,

2019, in Albuquerque, New Mexico, it had been driven for 3,995 miles. For

comparison, according to Google Maps, a trip from Gainesville, Florida, to

Sacramento, California, to Albuquerque, New Mexico, is 3,788 miles.

19.     Based on the above facts, it is my belief that R.WILLIAMS and

WILLIS both traveled to the West Coast to visit a source of supply for narcotics,

specifically a source for marijuana and marijuana oil cartridges, and that WILLIS

was caught driving the narcotics back to Florida in a rental car.

20.     On or about August 21, 2019, the Alachua County, Florida Sheriff's

Office conducted a traffic stop on a rental vehicle in which R.WILLIAMS was the

sole occupant. The plain odor of burnt cannabis was observed emitting from the

vehicle. A probable cause search of the vehicle was conducted. In excess of $4,000.00 in small denominations of US currency were found loosely strewn about the center console. Located amongst the currency were five cellular phones, a digital scale which contained a white residue on the balance, a box of sandwich bags, and small zip-lock baggies of the type commonly used for the sale of drugs. R.WILLIAMS received a written warning for the traffic violation and was released from the scene.

21.    On November 4, 2019, Florida Highway Patrol (FHP) conducted a traffic stop on a white Dodge caravan, identified as a rental vehicle. The driver and sole occupant of the vehicle was identified as R.WILLIAMS. While interacting with R.WILLIAMS outside of the vehicle, the Trooper noticed R.WILLIAMS began to become agitated. R.WILLIAMS regained access to the vehicle, while the Trooper attempted to stop him from fleeing the scene. R.WILLIAMS assaulted the Trooper and, despite being tased, R.WILLIAMS was able to flee the scene in the vehicle. Troopers were not able to apprehend R.WILLIAMS that day. The following day (November 5, 2019), FHP located R.WILLIAMS. FHP officers observed R.WILLIAMS running on foot into the Oaks Mall in Gainesville, Florida, while carrying a bag and the officers gave chase. R.WILLIAMS tossed the bag and two cell phones away from his person during the pursuit. R.WILLIAMS

was ultimately apprehended during the chase, and the bag and cell phones were recovered as evidence. R.WILLIAMS' bag was found to contain approximately: three grams of molly (a crystalline compound which, in part, contains MDMA, among other substances), one pill of MDMA ecstasy, 27.7 grams of crack cocaine (cocaine base), 54.7 grams of powder cocaine, 242.6 grams of marijuana, and various items of drug paraphernalia, including plastic baggies and a digital scale. R.WILLIAMS was also in possession of two cellular telephones, one of which was searched pursuant to a federal search warrant and found to contain drug-related text messages. The other cellular device was destroyed prior to R.WILLIAMS' apprehension.

22.     On December 23, 2019, following a bond reduction hearing in R.WILLIAMS' pending state case, R.WILLIAMS posted bond and was released from state custody at approximately 11:12pm on December 23, 2019.

23.     In the course of the investigation, the Government has applied for and been granted more than two dozen search warrants, primarily tracking warrants and warrants for electronically stored information, authorization for more than two dozen pen-register/trap-and-trace devices, several 2703(d) orders, and six Title III wiretap orders.

24.     On February 22, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc13-AW/GRJ, authorized the interception of wire and electronic communications occurring to and from (407) 714-7318 (TARGET TELEPHONE #1), whose primary user was R.WILLIAMS The interception began on February 24, 2020 and terminated on March 24, 2020.

25.     On March 17, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc24-AW/GRJ, authorized the interception of wire and electronic communications occurring to and from (347) 640-0270 (TARGET TELEPHONE #2), whose primary user was R.WILLIAMS. The interception began on March 18, 2020 and terminated on April 13, 2020.

26.     On April 3, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc30-AW/GRJ, authorized the interception of wire and electronic communications occurring to and from (352) 231-4729 (TARGET TELEPHONE #3), whose primary user is KING. An amended order was signed on April 6, 2020. The interception began on April 6, 2020. On May 5, 2020, the Court signed an order authorizing the continued

interception of communications over TARGET TELEPHONE #3 for an additional 30 days. Interception is schedule to terminate on June 3, 2020.

27.     On April 8, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc31-AW/GRJ, authorized the interception of wire and electronic communications occurring to and from (407) 714-7318 (TARGET TELEPHONE #1) and (505) 373-7957 (TARGET TELEPHONE #4), whose primary user is R.WILLIAMS. The interception began on April 9, 2020. On April 26, 2020, R.WILLIAMS obtained a new telephone number for the device assigned TARGET TELEPHONE #1 (same IMEI number but a new telephone number). A roll-over provision in the Court's order authorized the interception of wire and electronic communications occurring over this new telephone number, (850) 502-3756 (TARGET TELEPHONE #5). The interception of TARGET TELEPHONE #5 began on April 26, 2020. Interception of TARGET TELEPHONE #4 terminated on May 5, 2020.

28.     On May 8, 2020, the Honorable Allen C. Winsor, United States District Judge, in Northern District of Florida case number 1:20mc39-AW/GRJ, authorized the continued interception of wire and electronic communications occurring to and from TARGET TELEPHONE #5, and the initial interception of communications to and from (224) 532-7694 (TARGET TELEPHONE #6), whose

14

primary user is R. WILLIAMS. The interception began on May 8, 2020, and is scheduled to terminate on June 6, 2020.

29.     Elboric Quadarius ROBINSON, , a.k.a. "Bo" and "Bo-4K," is a United States citizen born December 16, 1990, and he is believed to reside at 15100 NW 150th Court, Apartment 6-3047, Alachua, Florida 32616. ROBINSON is a ranking member of the 4K gang, having released music videos under the moniker "Bo 4K." ROBINSON has also been identified as acting as a lieutenant to R. WILLIAMS. The investigation to date has revealed that ROBINSON is a partner and co-conspirators with R. WILLIAMS in their drug distribution activities.

30.     ROBINSON frequently spends time with R. WILLIAMS and has contact with him on a daily basis. During the course of the investigation, agents have intercepted communications in which ROBINSON discusses selling various controlled substances, as well as communications in which he obtained, or discussed obtaining, multiple ounces of cocaine, multiple grams of cocaine base (crack cocaine), ounces of marijuana, and prescriptions pills (Suboxone) from R. WILLIAMS and others. ROBINSON and R. WILLIAMS refer customers to each other and have discussed pooling their money to obtain multi-ounce or one kilogram-sized quantities of cocaine at a lower price per ounce. This would enable

15

them to break down the larger quantity of cocaine into smaller amounts for resale,

in addition to processing and turning the powder cocaine into crack cocaine.

**Intercepted communications regarding ROBINSON's involvement in the conspiracy**

31.     An intercepted phone call occurred on February 25, 2020 between

R.WILLIAMS on TARGET TELEPHONE #1 and ROBINSON at (352) 256-6415

at 14:32 EST which included:

> R.WILLIAMS: "Okay, I guess I'm fixin to hurry up and fly back that way then, Bo. Matter of fact, matter of fact, as a matter of fact,"… (U/I)… "Hey, as a matter of fact Bo, meet me, meet me at the Publix on, down there at the end, of the"…(U/I)… "we been going to…"
>
> ROBINSON: "Yeah…"
>
> R.WILLIAMS: "Meet me down there right quick, I'm, I'm fixin to hit the back way and come that way. Uh, hey, hey listen, he said, he said, I told him what you said, but then he said he could do uh, he say he would do, he say he would do nine, cause the other one shakey"… (U/I)… "he say he could do the ten, but that" … (U/I)… "I say nah, just do the nine, so you straight, if you straight with eight, I'm just going to get one."
>
> ROBINSON: "Alright."

Based upon my training, experience, knowledge of this investigation, and my

conversations with other experienced narcotics investigators, I believe that during

this phone call R.WILLIAMS told ROBINSON that he has arranged to purchase 9

ounces of a controlled substance, most likely cocaine, and that R.WILLIAMS

would be giving 8 of the 9 ounces to ROBINSON and reserving one for himself.

16

32.    On March 1, 2020, at 10:51 EST, R.WILLIAMS, using TARGET

TELEPHONE #1, called ROBINSON using (352) 256-6415, and the two

discussed the prices R.WILLIAMS was quoted by KING to buy a half kilogram of

cocaine:

> R.WILLIAMS: Hey that nigger ah that nigger talk crazy, that don't even add up man.
>
> ROBINSON: No.
>
> R.WILLIAMS: Yeah naw Now he talking about umm I told him to call so we could go through it now he talking about see it for the whole and now he want 18 5 for the half I said brah what he said doesn't even add up that that you go from 30 you go from 33 to 37 for for a half.
>
> ROBINSON: Yeah.
>
> R.WILLIAMS: Damn like that I said well 10 yeah.
>
> ROBINSON: Yeah.
>
> R.WILLIAMS: 10 something man.
>
> ROBINSON: For real.
>
> R.WILLIAMS: Hell yeah shit what what what you think what what what you think Chris and them do for like 17 of them hello, hello..you heard me?
>
> ROBINSON: That what he act like he doesn't want to budge bro because he driving them bitches.
>
> ROBINSON: yeah.
>
> R.WILLIAMS: so why why what about why Your other boy handle, you think he'll handle it? Your boy for 975 that's the half I did
>
> ROBINSON: (U/I) 5.
>
> R.WILLIAMS: Remember Niece?
>
> ROBINSON: Oh shit bro um I don't know.

17

R.WILLIAMS: I feel you on that.

ROBINSON: I said I was really waiting on him to hit me back but I don't like the way that shit went.

R.WILLIAMS: you talking about when you talking about when you you grabbed grabbed that last half?

ROBINSON: Like they what you look like you crying and shit talking about its like this its like this right there this shit you bring me I have to go through it and then come right back probably be back in less than 30 minutes and then (U/I)

R.WILLIAMS: yeah now there ain't nothing (U/I)

ROBINSON: Man shit I don't like where that shit went bro.

ROBINSON: I said I check with Chris though.

R.WILLIAMS: I mean you don't (U/I) you know you got I don't know.

ROBINSON: Talking about Chris?

R.WILLIAMS: Oh yeah yeah yeah that's what is up that's shits a half, that's a half Damn near half one short up a half you know U/I bit with that trying tryin for one you know you get me a little in between if he really wanted to.

ROBINSON: yeah let me see let me call him right quick.

R.WILLIAMS: Alright let me know.

ROBINSON: Yeah.

Based upon my training, experience, knowledge of this investigation, and my conversations with other experienced narcotics investigators, I believe that in this conversation, ROBINSON and R.WILLIAMS expressed dissatisfaction with the price that KING was quoting them for a half kilogram of cocaine, and R.WILLIAMS referred to a price of $975 per ounce that ROBINSON has paid in the past for ounce quantities of cocaine to a different source of supply.

18

R.WILLIAMS was attempting the compare what paying $975 per ounce would

cost for roughly a half kilogram (17.6 ounces). R.WILLIAMS was using the $975

figure as a measure to compare to how much $18,500 broken down into ounces

would come out too. If R.WILLIAMS and ROBINSON were able to purchase the

cocaine in larger quantities and break it down into ounces at a cheaper price, the

$975 per ounce would be worth it. ROBINSON also pointed out that having a

larger quantity on hand means he wouldn't go through his portion as fast.

ROBINSON said he'll check with "Chris," an unknown supply of cocaine, to

compare prices.

33.     On March 21, 2020, starting at 19:36 EDT, R.WILLIAMS was out of

town and used TARGET TELEPHONE #2 to agree to sell Dante James, (352) 213-

3676, a gram (a "g") of powder cocaine ("girl") at R.WILLIAMS' grandma's

house. R.WILLIAMS called ROBINSON, and arranged for him to sell James the

gram of cocaine when he arrived.

34.     On March 22, 2020, starting at approximately 9:10 am,

R.WILLIAMS, on TARGET TELEPHONE #2, received two text messages from

(386) 266-6813, including "I need ya." R.WILLIAMS then spoke with an

unknown male at (386) 266-6813 at 10:48 am, which involved the unknown male

saying "oh man, god damn I need ya, I need every stuff" and asking where

R.WILLIAMS was. R.WILLIAMS replied that he was out of town, but "U/I call Bo and see where he at ..U/I.. in Alachua though right?" In a subsequent phone call at 11:04 am, the unknown male told R.WILLIAMS that "I'm headed there." And R.WILLIAMS told the unknown male "he probably gonna want you go to Hitchcock's Bro." At 11:11 am, R.WILLIAMS then called ROBINSON and asked him, "yeah you want to take a half down to Hitchcock's, for ah Providence?" And ROBINSON agreed to do so. R.WILLIAMS then had phone calls or texts with both the unknown male and ROBINSON informing them about what vehicle the other would be driving, to facilitate them meeting. ROBINSON sent a text to R.WILLIAMS at 11:23 am which said "How much if givin you?" and corrected himself, immediately texting "He." R.WILLIAMS replied at 11:25 am, "570." The unknown male called R.WILLIAMS again at 11:33 am, and their conversation included him saying, "Alright bro I got it." and "I gave him 575." ROBINSON sent a text message at 11:40 am, which read "Done 575." Base on my training, experience and knowledge of the investigation, I believe that in this extended exchange of texts and phone calls, the unknown male called R.WILLIAMS to buy a half ounce of cocaine. R.WILLIAMS was out of town, so he arranged for ROBINSON to sell the unknown male the half ounce of cocaine. ROBINSON met with the unknown male and completed the sale for $575.

35.    On March 26, 2020, at 1:08pm, R.WILLIAMS received an incoming

call on TARGET TELEPHONE #2 from ROBINSON using (754) 339-8045:

> ROBINSON: Boy, I think them bitches got the drop on a semi down in this bitch.
>
> R.WILLIAMS: For real?
>
> ROBINSON: Hell yeah…
>
> R.WILLIAMS: A semi?
>
> ROBINSON: A semi, cuz. A-a-a CRST, uh, semi. You, you know a CS on the side of the truck before, the CRST?
>
> …
>
> R.WILLIAMS: What the fuck? Who, who just got 'em?
>
> ROBINSON: Goddamn State Trooper. Bitch ain't nothing but K9 State Troopers and the K9 Alachua.
>
> R.WILLIAMS: Aww, man.
>
> ROBINSON: Honest, be like, they just got a hit on, on a semi boy.
>
> R.WILLIAMS: What, is they searching it?
>
> ROBINSON: Boy, hell yeah…
>
> R.WILLIAMS: Hey, I'm fixing to change my number.
>
> ROBINSON: Why?
>
> R.WILLIAMS: I, I, I just had that nigga in Hague.
>
> ROBINSON: Huh?
>
> R.WILLIAMS: I just met him, him in Hague, bro.
>
> ROBINSON: For real?
>
> R.WILLIAMS: Yeah.
>
> ROBINSON: Oh yeah, boy, they, they just zap, yeah they just popped him.
>
> R.WILLIAMS: Aww, man.
>
> ROBINSON: It's this number?

R.WILLIAMS: Yeah.

ROBINSON: Oh, shit. Yeah, let me change this shit:

…

ROBINSON: Goddamn, bitch. I think it's time for us to change both of our numbers, boy.

…

ROBINSON: There was no [unintelligible] it was little shit?

R.WILLIAMS: Yeah.

ROBINSON: He could have, like, he could have ate that bitch at any time?

R.WILLIAMS: A basketball.

Based on my training, experience and knowledge of the investigation, I believe ROBINSON called R.WILLIAMS to tell him about a traffic stop happening in Alachua. R.WILLIAMS recognized that the driver of the semi-truck was a recent customer of his (Clifford Belle). R.WILLIAMS told ROBINSON that incriminating communications with Belle were conducted over TARGET TELEPHONE #2, and both agreed that they both should get new phones. ROBINSON asked R.WILLIAMS about the amount he sold, and if it was small enough to hide or ingest, thus potentially preventing detection by law enforcement. R.WILLIAMS told ROBINSON that he had sold Belle 3.5 grams ("a basketball"). On March 26, 2020, the Florida Highway Patrol (FHP) had, in fact, conducted a traffic stop of the vehicle referred to by ROBINSON. The traffic stop was conducted based on information obtained over the intercept of TARGET

TELEPHONE #2. Upon searching Belle, two individual baggies were located, one contained approximately one gram of cocaine and the second contained approximately 3.5 grams of cocaine confirming the coded language used of "a basketball".

36.     On April 11, 2020, at approximately 7:04pm, and documented in session number 730, R.WILLIAMS received an intercepted, incoming call on TARGET TELEPHONE #4 from WILLIS at (352) 231-9299. The following are excerpts from their conversation:

> WILLIS: Hey uh, you, you got any M?
> R.WILLIAMS: Uh, I think Bo got some.
> WILLIS: Bo got some?
> R.WILLIAMS: Yes
> WILLIS: What's he doing for the ball?
> R.WILLIAMS: I think forty, fifty, something like, I think forty. Maybe he'll do you for forty.
> …
> WILLIS: Alright, you get any new tree?
> R.WILLIAMS: Um, U/I, I had got some more OG shit today.
> WILLIS: Oh yeah?
> R.WILLIAMS: Last night actually.
> (Talking over each other)
> R.WILLIAMS: Yeah, you can check it out.
> WILLIS: Alright, just let me know when you're free. I'll be in, I'll be at the rood. Rabbi still got them subs?
> R.WILLIAMS: Yep.

WILLIS: Alright, I'm uh grab them from him.

R. WILLIAMS: Alright.

Based on my training, experience, and knowledge of the investigation, I believe that in the first part of the conversation, WILLIS was inquiring about the availability of Molly (likely a synthetic cathinone). Although R. WILLIAMS did not have any, R. WILLIAMS directed WILLIS to contact ROBINSON for some. R. WILLIAMS suggested that ROBINSON may charge between $40 and $50 for an eighth of an ounce (3.5 grams) of Molly. In the second part of the conversation, R. WILLIAMS advised that he picked up a new variety of marijuana the night before. In addition, R. WILLIAMS confirmed that J. WILLIAMS was still in possession of Suboxone, and WILLIS indicated that he intended to come purchase them.

37.    On April 13, 2020, at approximately 1:41pm, and documented in session number 5966, R. WILLIAMS placed an intercepted, outgoing call from TARGET TELEPHONE #1 to ROBINSON at (352) 256-6415. The following is an excerpt from their conversation:

R. WILLIAMS: Where you at, boy?

ROBINSON: On the Four.

R. WILLIAMS: Ah, ah, asking for them blue ones. You got some?

ROBINSON: Huh?

> R.WILLIAMS: I said my boy want some of them blue ask for some of them blue ones. You got some?
>
> ROBINSON: Yeah.

Based on my training, experience and knowledge of the investigation, I believe that ROBINSON was on 134th Terrace, in Alachua, Florida ("the Four"). R.WILLIAMS inquired about the availability of oxycodone 30mg pills ("blues"), and ROBINSON replied that he had some available for sale.

38.     On April 15, 2020, at approximately 2:37pm, and documented in session number 1745, R.WILLIAMS placed an intercepted, outgoing call to ROBINSON. The following is an excerpt from their conversation:

> R.WILLIAMS: Uh, I need to see if you're trying to get off a ball?
>
> ROBINSON: Huh?
>
> R.WILLIAMS: You say, you say you trying to get off a ball?
>
> ROBINSON: Of girl?
>
> R.WILLIAMS: Yeah.
>
> ROBINSON: Hell yeah, yeah.
>
> R.WILLIAMS: Alright. I'm uh call you right back.

Based on my training, experience, and knowledge of the investigation, I believe that R.WILLIAMS was asking ROBINSON if he had an eighth of an ounce (a "ball") of powder cocaine ("girl") available for sale. ROBINSON confirmed that he did.

39.     On April 16, 2020, at approximately 10:49am, and documented in session number 1944 on TARGET TELEPHONE #4, R.WILLIAMS received an intercepted, incoming call from (352) 256-8434, which is believed to belong to Amanda Carlton. The following is an excerpt from their conversation:

> Carlton: trying to get a G from you.
>
> R.WILLIAMS: Ah, let me trying uh, you have to come to Alachua cause I ain't got none my cousin's got some.
>
> Carlton: K I gotta go to Alachua?
>
> R.WILLIAMS: Yeah cause my cousin the only one who got, got some.
>
> (Talking over each other)
>
> R.WILLIAMS: Huh?
>
> Carlton: Same shit, right?
>
> R.WILLIAMS: Yeah, yeah, it's the same shit, yeah.

Based on my training, experience and knowledge of the investigation, I believe that Carlton wanted to purchase a gram of cocaine from R.WILLIAMS. Due to R.WILLIAMS' unavailability, R.WILLIAMS directed Carlton to Alachua to meet with ROBINSON.

40.     On April 16, 2020, at approximately 10:52am, and documented in session number 1945 on TARGET TELEPHONE #4, R.WILLIAMS placed an intercepted call to ROBINSON. The following is an excerpt from their conversation:

> R.WILLIAMS: Oh, hey, uh, Preston's girl, trying come, trying um, gonna come to Alachua, a G.
>
> ROBINSON: Alright.

Based on my training, experience and knowledge of the investigation, I believe that R.WILLIAMS was coordinating a narcotics transaction for one gram of cocaine between Carlton and ROBINSON.

41.     On April 16, 2020, at approximately 11:24am, and documented in session number 1956 on TARGET TELEPHONE #4, R.WILLIAMS placed an intercepted, call to ROBINSON. The following is an excerpt from their continued conversation:

> R.WILLIAMS: You say where you want want her to come at
>
> ROBINSON: Go to the spot I'm fixing to head over there

Based on my training, experience and knowledge of the investigation, I believe R.WILLIAMS was continuing to coordinate a narcotics transaction between ROBINSON and Carlton.

42.     On April 16, 2020, at approximately 11:25am, and documented in session number 1959 on TARGET TELEPHONE #4, R.WILLIAMS received an intercepted incoming call from (352) 256-8434, which is believed to belong to Amanda Carlton. The following is an excerpt from their conversation:

> R.WILLIAMS: Remember that house past the church?
>
> Carlton: Uh huh

R.WILLIAMS: Yeah

Carlton: I ain't passed, I gotta pass, Oh, I'm picking up some money right now but I'm in Jonesville headed out your way now.

…

R.WILLIAMS: Alright, well how long for you going to be like 10 minutes?

Carlton: Uh, probably 20 minutes at the most.

Based on my knowledge, training and experience of the investigation, I believe that R.WILLIAMS was continuing to coordinate the narcotics transaction between Carlton and ROBINSON.

43.     On April 16, 2020, at approximately 11:28am, and documented in session number 1961 on TARGET TELEPHONE #4, R.WILLIAMS sent an intercepted, outgoing text message to ROBINSON that stated, "she will be there in 20".

44.     On April 16, 2020, at approximately 11:51am, and documented in session number 1972 on TARGET TELEPHONE #4, R.WILLIAMS received a intercepted, incoming from (352) 256-8434, which is believed to belong to Amanda Carlton. The following are excerpts from the conversation:

Carlton: Yeah, I just passed your grandma's house
R.WILLIAMS: Ok, ok.

…

R.WILLIAMS: Ok, go, go through that stop sign.

…

28

R.WILLIAMS: Uh huh, it's going to be that house right, right after that church.

Carlton: The house right after the church?

R.WILLIAMS: Yeah, the blue house. Pull, pull…

Carlton: The blue house right here?

R.WILLIAMS: Pull in the backyard, pull in the backyard, pull in the backyard, pull around back.

Based on my training, experience and knowledge of the investigation, I believe that R.WILLIAMS was directing Carlton turn-by-turn to the correct house to meet with ROBINSON.

45.     On April 16, 2020, at approximately 11:52am, and documented in session number 1973, R.WILLIAMS placed an intercepted to ROBINSON. The following is an excerpt from their conversation:

R.WILLIAMS: Hey, she was there, cuz.

ROBINSON: Alright.

Based on my training, experience, and knowledge of the investigation, I believe that R.WILLIAMS was letting ROBINSON known that the customer, Carlton, was there and waiting on him (ROBINSON).

46.     On April 16, 2020, beginning at approximately 11:53am, and documented in multiple sessions, R.WILLIAMS had an intercepted text message conversation with (352) 256-8434, which is believed to belong to Amanda Carlton. The following are excerpts from their conversation:

> R.WILLIAMS: He bout to pull up
>
> Carlton: Yes I good

Based on my training, experience, and knowledge of the investigation, I believe that Carlton told R.WILLIAMS that the narcotics transaction he had arranged between Carlton and ROBINSON had been consummated.

47.     On April 17, 2020, at approximately 7:42pm, and documented in session number 2523, R.WILLIAMS received an intercepted, incoming call on TARGET TELEPHONE #4 from ROBINSON at (754) 399-8045. The following are excerpts from their conversation:

> ROBINSON: Shit, so what you got, boy?
>
> R.WILLIAMS: U/I
>
> ROBINSON: Huh?
>
> R.WILLIAMS: U/I
>
> ROBINSON: I can't hear you, bro. I can't hear you, bro. Your hand or something…
>
> R.WILLIAMS: Yeah, yeah, yeah.
>
> …
>
> ROBINSON: Alright, alright, man. Hey, I got some, I got some, yeah, I got some girls, too.
>
> R.WILLIAMS: Yeah.

Based on my training, experience and knowledge of this investigation, I believe that R.WILLIAMS confirmed to ROBINSON that he (R.WILLIAMS) possessed crack cocaine ("boy"), and that ROBINSON alerted R.WILLIAMS to the fact that he (ROBINSON) had obtained more powder cocaine ("girls").

48.     Immediately thereafter, on April 17, 2020, at approximately 7:43pm, and documented in session number 2524, R.WILLIAMS sent an intercepted, outgoing text message to an unknown user of a cellular telephone assigned phone number (352) 872-0588. The message stated, "The girl back good". Based on my training, experience and knowledge of this investigation, I believe that R.WILLIAMS was alerting a prospective narcotics customer that R.WILLIAMS had cocaine available for sale, based on the fact that ROBINSON had been resupplied.

49.     On April 17, 2020, at approximately 11:43pm, and documented in session number 2572, R.WILLIAMS placed an intercepted call to ROBINSON. The following is an excerpt from their conversation:

> R.WILLIAMS: Hey, you think um, 9 G on, I mean 8 G on 19 too much?
>
> ROBINSON: Right now, probably ain't no telling. Right now, I don't know, boy. I can't really say yay or nay.
>
> R.WILLIAMS: I feel you.
>
> ROBINSON: I don't know, that what you, what you, what you fittin, oh, you talking about spread?
>
> R.WILLIAMS: Nah, my last, my last little 19 G's of, of girl. I ain't drop it, I was just going, sell that bitch, U/I put something on that last bitch.
>
> ROBINSON: You said what now? Say it again.
>
> R.WILLIAMS: My last, my last little 19 G's of girl, I was just going to sack it up and put something on that bitch though.

31

ROBINSON: Yeah, shit, they going to get it.

Based on my training, experience, and knowledge of the investigation, I believe that R.WILLIAMS was contacting ROBINSON to get advice, and asked ROBINSON whether putting eight grams of cut, or filler, into R.WILLIAMS' remaining 19 grams of cocaine was too much. ROBINSON replied that with the shortages and price increases occurring lately, he could not really say whether that was too much filler, but ultimately agreed that people would buy it.

50.    On April 20, 2020, at approximately 8:33pm, and documented in session number 6888, R.WILLIAMS placed an intercepted, outgoing call from TARGET TELEPHONE #1 to Rakeidra NEAL at (352) 275-4498:

> NEAL: I said, who Rab be getting those Suboxones from?
> R.WILLIAMS: Sub, Suboxones?
> NEAL: Yeah, them pills.
> R.WILLIAMS: They pressed. I got (stuttering) six of them right now, Rock.
> NEAL: How much?
> R.WILLIAMS: I don't know what they go a piece. I don't know.
> NEAL: Cracker, cracker just asked me for some. I don't know how much them bitches go either.
> R.WILLIAMS: Hey, hey, hey, hey Rabbi, hold up, let U/I call you back. Call Bo, ask him what they go for. Call Bo.
> NEAL: Alright.

Based on my training, experience and knowledge of this investigation, I believe that NEAL had a prospective narcotics customer who wanted to purchase

Suboxone. NEAL called R.WILLIAMS to ascertain where Jessie "Rabbi"

Williams sourced the pills. R.WILLIAMS advised that the pills were pressed, and

suggested that NEAL contact Elboric ROBINSON for further details.

51.     On April 23, 2020, at 14:56 EDT, R.WILLIAMS received a phone call

from ROBINSON at (352) 256-6415. The following is an excerpt of the

conversation:

> R.WILLIAMS: Hello (stutters)
>
> ROBINSON: You good?
>
> R.WILLIAMS: Yeah, I'm good. I'm good bro. That nigga, (inaudible) I'm telling you brah.
>
> ROBINSON: Where you at?
>
> R.WILLIAMS: Huh?
>
> ROBINSON: Where you at?
>
> R.WILLIAMS: Latasha (stutters) said you got your stick on you.
>
> ROBINSON: I just got my key, I'm going to get my stick
>
> R.WILLIAMS: Alright
>
> ROBINSON: Hey what they talking about what…Huh
>
> R.WILLIAMS: Brah, I wasn't sure. I (stutters) listen brah I (stutters) had to grab my shite and get (inaudible)
>
> ROBINSON: Yeah Hell yeah (inaudible name) said he all up on all the shed shit. He said he up on all the shed shit.
>
> R.WILLIAMS: Yeah Yo Dan (inaudible)
>
> ROBINSON: Oh Butterbaby shed up in here.
>
> R.WILLIAMS: Yeah Danny ran that bitch up here he ran that bitch in the shed

ROBINSON: I'm coming right now brah, I'm going I got I had to go get my I had to get my stick, I had to go get my key bro. I forgot by damn key wasn't in the damn car. I had to turn around. I was gonna slash his ass dog.

R.WILLIAMS: He still down though.

ROBINSON: Yeah shit. He might be fucked up he might be dead.

Based on my training, experience, and knowledge of the investigation, I believe this conversation took place just after an unknown subject attempted to shoot R.WILLIAMS was run over by WILLIS driving a motor vehicle. ROBINSON advised he forgotten the keys to his car where his firearm ("stick") was during the shooting, so he had to go back for it. ROBINSON advised that he had recently retrieved the firearm.

52.     On April 28, 2020, at approximately 10:05am, and documented in session number 32, R.WILLIAMS placed an intercepted, outgoing call from TARGET TELEPHONE #5 to ROBINSON at (352) 256-6415. The following are excerpts from their conversation:

ROBINSON: Shit, I gotta save your number. I almost didn't answer that shit.

…

R.WILLIAMS: That shit high right now, feel me?

ROBINSON: Get that registered and then, them bitches thirteen man, them bitches U/I bout like twelve-five, thirteen U/I register that these bitches is high U/I a nigga can shake some shit bro but at the moment bruh nigga can't shake nothing bruh, I can't shake nothing bruh. I'm talking bout, man one of my white boys gave me three-fifty, you know

34

what I'm saying? U/I, but I ain't feel like I'm U/I right now. I still feel like I ain't getting the U/I.

R.WILLIAMS: Yeah, I be getting like three-seventy-five.

...

ROBINSON: I mean, it's straight bruh, I can live off it, but U/I you can have it, fuck it.

R.WILLIAMS: Yeah, I mean Coda them people had, had, had that real thing for thirteen.

ROBINSON: If it's that real thing boy, I can work with it, bro.

...

R.WILLIAMS: W-w-what you said, Bo? You said wait, wait till the world open back up?

ROBINSON: Yeah, that's what he had told me. He said U/I bruh you might wanna wat till the world open back up and just keep yo people up cause U/I shit aggravating a nigga, he said man he feel like he getting ran around too, I don't know, bruh. You'll never know.

Based on my training, experience, and knowledge of the investigation, I believe that in this telephone call R.WILLIAMS and ROBINSON discussed the difficulties in obtaining cocaine, and the resultant high prices, because of the COVID-19 pandemic. ROBINSON advised that at even $1,250 to $1,300 per ounce, cocaine was still difficult to source. R.WILLIAMS stated that KING's ("Coda") connection had high quality cocaine (the "real thing"), but it cost $1,300 per ounce. ROBINSON advised that he had a customer pay $350 for 1/8th ounce quantity, while R.WILLIAMS advised that he was getting $375. ROBINSON lamented that the profit margin was slim, stating that he could merely "live off" the proceeds

derived from the sale of cocaine. ROBINSON further stated that he was being advised to wait until "the world open up" before he could expect to receive consistent product availability and lower prices.

## CONCLUSION

53.    Based upon the above facts and my experience in the participation of numerous arrest and search warrants, I believe probable cause exists to believe that Elboric Quadarius Robinson knowingly conspired to distribute and possess with intent to distribute more than 500 grams of a mixture containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B) and 846, unlawfully used a communication device, in violation of 21 U.S.C. § 843(b), and possessed a firearm in furtherance of a drug-trafficking offense, in violation of 18 U.S.C. § 924(c), in the Northern District of Florida.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Respectfully submitted,

Bradley T. Dando
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 19 day of May, 2020.

GARY R. JONES
UNITED STATES MAGISTRATE JUDGE

37